IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

**In the Matter of:**
**DesChamps Building Corporation,**
                  **Debtor.**                  **Case No: 03-06249-8-JRL**

---

**Patrick Munro and**
**Compasspointe Holding, LLC,**            **Adversary Proceeding**
                  **Plaintiffs,**           **No: L-03-00159-8-AP**

**v.**

**DesChamps Building Corporation,**
                  **Defendant,**

**and**

**DesChamps Building Corporation**
**and David M. DesChamps,**
                  **Third-Party Plaintiffs,**

**v.**

**Cynthia Munro,**
                  **Third-Party Defendant.**

---

### ORDER

The matter before the court is the counterclaim of David M. DesChamps ("DesChamps") and DesChamps Building Corporation ("DBC") against Patrick Munro ("Munro") and CompassPointe Holdings, LLC ("Compass") seeking damages for defamation. A trial was held on March 17, 2005 in

1

Wilmington, North Carolina. Pursuant to Federal Rule of Bankruptcy Procedure 7052, this Order contains findings of fact and conclusions of law based thereon.

## PROCEDURE

On July 15, 2003, DBC filed for Chapter 11 relief in this court. On December 8, 2003, Munro and Compass filed this adversary proceeding against DBC and DesChamps alleging in the complaint that DesChamps embezzled funds from a construction loan.

On January 23, 2004, the court held a hearing and confirmed the Chapter 11 plan in the underlying case. On February 6, 2004, DBC and DesChamps filed responsive motions, an answer, counterclaim, and a third-party complaint. In the counterclaim against Compass and Munro, DBC and DesChamps alleged claims of breach of the construction contract, unjust enrichment, slander per se and libel per se and sought punitive damages. In the third-party complaint against Cynthia Munro, DBC and DesChamps alleged breach of contract and unjust enrichment.

On March 18, 2004, Munro and Compass filed motions, a reply to the defendants' counterclaim, and an answer to the third-party complaint. On April 29, 2004, DBC and DesChamps filed a motion for judgment on the pleadings. On May 6, 2004, the court conducted a hearing on the parties' respective motions. The court denied all of the parties' motions with the exception of granting the defendants' motion to quash the plaintiffs' deposition notices and subpoenas. Moreover, the court gave the plaintiffs time to amend their answer to conform with Rule 8(b) of the Federal Rules of Civil Procedure. On June 4, 2004, Munro and Compass filed an amended reply and answer to the counterclaim and third-party complaint of DesChamps and DBC.

On July 22, 2004, the court conducted a pre-trial conference and entered a scheduling order. The

court ordered for all discovery to be completed by September 21, 2004 and for all motions to be filed by October 20, 2004. On September 8, 2004, Munro and Compass voluntarily dismissed DesChamps, leaving DBC as the sole defendant to the embezzlement claim.

Thereafter, the parties filed competing motions for summary judgment. On December 15, 2004, the court conducted a hearing on the motions for summary judgment. On January 7, 2005, the court entered an order granting summary judgment in favor of the defendants on the plaintiffs' embezzlement claim and granting summary judgment in favor of the plaintiffs on the defendants' counterclaims of breach of contract and unjust enrichment. The order, however, failed to address DBC and DesChamps' third party claims of breach of contract and unjust enrichment against Cynthia Munro. Maintaining the same rationale applied to the counterclaims of breach of contract and unjust enrichment, the court grants summary judgment in favor of Cynthia Munro on the third-party claims.

This leaves DBC and DesChamps' counterclaim of slander per se, libel per se, and punitive damages against Munro and Compass. The debtor filed this compulsory counterclaim seeking damages for post-petition defamation based upon the plaintiffs' dissemination of statements that the debtor had embezzled or misused Munro's money. Bankr. R. 7013 ("A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . ." ). The court finds that it has jurisdiction over the counterclaim, pursuant to 28 U.S.C. § 157(b)(2)(C), as this is a counterclaim by the estate against persons filing claims against the estate.

## STATEMENT OF FACTS

1.     DesChamps is a resident of New Hanover County, North Carolina.

2. DBC is a North Carolina corporation solely owned by DesChamps.

3. Munro is a resident of Brunswick County, North Carolina.

4. Munro's wife, Cynthia, is a resident of Honolulu, Hawaii.

5. Compass is a North Carolina limited liability company with its principal place of business in New Hanover County, North Carolina.

6. Pursuant to a contract dated February 4, 2003, the Munros hired DBC to build a custom residential home on Lot 56 in Devaun Park, a subdivision located in Brunswick County, North Carolina (the Project).

7. DBC received the total sum of $87,357.50 (Draw Total) from the Munros and Compass towards the construction of the Project.

8. DBC received the Draw Total in the form of three checks issued and made payable to Compass and DBC jointly in the amounts of $34,943.00 on February 5, 2003, $30,000 on April 17, 2003, and $22,414.50 on June 19, 2003.

9. Munro, on behalf of Compass, endorsed each of the three checks making up the Draw Total.

10. Compass received a construction loan from Cooperative Bank with the Munros as guarantors. The Bank set up a construction account. DesChamps was not authorized to unilaterally access that account.

11. DBC incurred invoices in the total amount of $85,539.02 (Hard Costs) towards the construction of the Project.

12. DBC paid $38,591.96 of the Hard Costs incurred in the construction of the Project.

13. The Draw Total received by DBC is $48,765.52 more than what was paid on the Hard Costs incurred in the construction of the Project. However, on the date of the bankruptcy, DBC had put $85,539.02 of costs and material into the Project.

14. On July 15, 2003, DBC filed for relief under Chapter 11.

15. On the same day as the bankruptcy filing, DesChamps contacted the Munros and arranged to meet with them that morning. At the meeting, DesChamps told the Munros that DBC had filed bankruptcy. He explained that his new employer, Whitney Blair, Inc., would complete the Project at the same price and on the same terms as had been negotiated by the Munros and DBC. The Munros rejected this offer and did not want to engage in any further business with DesChamps.

16. On July 21, 2003, DBC filed a Motion to Reject Executory Contract. On August 7, 2003, the court entered an order allowing that motion.

17. Within days after DBC filed bankruptcy, Munro spoke to Scott D. Stewart ("Stewart"), one of the developers of Devaun Park, by telephone. Specifically, within the month of DBC's bankruptcy filing, Munro spoke to Stewart approximately six times by telephone and approximately two times in person. At the time of the conversations with Munro, Stewart had already heard of the bankruptcy filing, as DesChamps had personally informed him by telephone. Stewart was interested in Munro completing the Project, as Munro's unfinished house was left standing in DeVaun Park. Stewart advised Munro to accept his losses and move forward with the completion of the Project. He volunteered to meet with Munro in order to assist him in moving forward. During the conversations, Munro told Stewart that DesChamps had misappropriated Munro's funds. Munro wanted to examine DesChamps' personal and professional life in order to determine where the money allocated to the Project had gone. Munro told Stewart the types

5

of recourse he intended to pursue against DesChamps, including his plan to bring a complaint before the North Carolina Licensing Board for General Contractors and to have DesChamps arrested. Stewart stated that Munro was fixated on this matter and had a personal vendetta against DesChamps. Stewart told approximately 12 other people in the local building industry of this matter. As a result of these occurrences, Stewart said he would no longer recommend or use DBC or Whitney Blair for any projects. (The court finds Stewart's testimony to be credible).

18. Vaughn Stanaland, co-developer of Devaun Park, testified that DesChamps had a reputation as a good builder. Through conversations with Stewart, Stanaland learned about Munro's statements regarding DBC and DesChamps' alleged misappropriation of funds. Stanaland did not communicate this information to other people.

19. Within approximately two days of DesChamps' bankruptcy filing, Munro telephoned Shirley Strangstalien, the Assistant Vice President and Loan Originator of the Mortgage Lending Department at Cooperative Bank. Strangstalien reviews and underwrites mortgage loans and works with customers throughout the construction process. In conversation with Strangstalien, Munro stated that DesChamps had misappropriated his money. At trial, Munro admitted that "misappropriation was a common thread at that time."

20. Within approximately one week to ten days from the date of bankruptcy, Munro engaged in a telephone conversation with Dixon Bridger, Senior Vice President of the Mortgage Lending Department at Cooperative Bank, and spoke to him on several occasions thereafter. Based on Bridger's deposition, Munro told Bridger that "he had been taken," that the work on the Project had not been completed or performed properly, and that the money had not been used for its intended purpose. Munro

6

conveyed to Bridger that DesChamps had stolen Munro's money.

21. A few weeks after the bankruptcy filing, Mark A. Brisson ("Brisson"), majority owner of The Coastal Window and Door Center, called Munro seeking payment of $19,000.00 for windows and doors supplied to the Project. Munro returned Brisson's telephone call. In a conversation lasting only a few minutes, Munro stated that DesChamps had filed bankruptcy on behalf of DBC, that the funds for the Project had been misused, and that the funds for the windows were not available. Brisson mentioned the conversation to two officers of his corporation.

22. DesChamps testified that, if the Project had continued, the money to pay The Coastal Window and Door Center would have come from the next draw amount.

23. In August 2003, the Munros and Compass filed a complaint with the North Carolina Licensing Board for General Contractors against DBC and DesChamps. Joel Macon ("Macon") was the assigned field investigator to the case. During the investigation, Macon regularly received telephone calls from Munro on Fridays. Macon was typically at job sites during the week, but he was available at his office on Fridays.

24. On September 8, 2003, Munro received a facsimile from DBC and DesChamps which set forth an accounting of monies paid on the Project. Munro admitted at trial that the facsimile provided him with some clarity as to where the money had gone.

25. On October 13, 2003, the Wilmington Police Department issued three warrants for arrest against DesChamps for embezzlement.

26. DesChamps was arrested, processed, and released on October 30, 2003.

27. In November 2003, Munro provided a victim impact statement to the New Hanover

County District Attorney's Office regarding the embezzlement charges against DesChamps.

28.     On December 8, 2003, Munro and Compass filed this adversary proceeding in this court against DBC and DesChamps alleging embezzlement. Munro later dismissed DesChamps as a defendant but maintained the claim against DBC.

29.     On February 2, 2004, as a result of the investigation before the North Carolina Licensing Board for General Contractors, Macon concluded that DBC had committed a violation by failing to reveal its bankruptcy filing to the Licensing Board within the required 30-day period. On March 5, 2004, the Review Committee of the Licensing Board convened and considered the complaint filed against DBC and DesChamps. The Committee agreed to accept DBC's admission of the violation in lieu of conducting a disciplinary hearing, and it determined that any future renewal application for DBC's license must be accompanied by a current audited financial statement and a classified balance sheet, subject to the approval of the board.

30.     On February 9, 2004, three indictments for embezzlement were issued against DesChamps.

31.     On April 16, 2004, the New Hanover County District Attorney's Office dismissed the criminal charges against DesChamps.

32.     Since 1998, DesChamps has worked as a paid employee of DesChamps Appraisal Group, which is his father's business. DesChamps is not a certified appraiser, but he engages in appraisal work as a registered trainee. DesChamps and his father are natives of Wilmington. DesChamps' father has engaged in real estate and appraisal services in the Wilmington area throughout his professional life. During the previous seven years, DesChamps Appraisal Group had received approximately $3500 to $7500 of appraisal work annually from Cooperative Bank. Within days after Bridger's deposition of August 31,

2004, Bridger informed DesChamps Appraisal Group that it was no longer on the approved list of appraisers. Since that time, DesChamps Appraisal Group has received no business from Cooperative Bank.

33.    On January 7, 2005, this bankruptcy court entered an order granting summary judgment to the defendants on the plaintiffs' embezzlement claim finding that the plaintiffs could not succeed on the tort claim under North Carolina law.  There was no evidence that DBC embezzled any of the plaintiffs' money, and DBC and the plaintiffs did not share a fiduciary relationship to support a claim for embezzlement..

34.    As a result of the criminal proceedings against him, DesChamps is trying to have three felony charges expunged from his record.

35.    Munro's statements against DBC and DesChamps have negatively impacted DesChamps' marriage, relationship with his young daughter, and social life. DesChamps and his wife used to enjoy social activities but now avoid them as a result of the humiliation caused by the accusations against DBC and DesChamps. DesChamps' temperament has been negatively affected due to stress and embarrassment caused by the situation.

## CONCLUSIONS OF LAW

Defamatory statements may be protected by an absolute privilege. At the beginning of trial, Munro and Compass moved in limine to exclude certain exhibits and testimony asserting that they are absolutely privileged as part of a judicial, quasi-judicial, or administrative proceeding. The exhibits and testimony include: (1) Defendants' Exhibit 20– "Notice of the Filing of a Complaint Against a Licensee" and accompanying complaint documentation to the North Carolina Licensing Board for General Contractors;

9

(2) Defendants' Exhibit 24– victim impact statement of Munro provided to the New Hanover County District Attorney's Office; (3) Defendants' Exhibit 25– affidavit of Shirley Strangstalien filed in this case; and (4) the testimony of Joel Macon of the North Carolina Licensing Board for General Contractors regarding the facts and circumstances surrounding the allegations in the counterclaim, the complaint to the Licensing Board, and damages. It is clear that an absolute privilege will protect a defamatory statement "made in due course of a judicial proceeding" even though it is made with express malice. Jarman v. Offutt, 239 N.C. 468, 472, 80 S.E.2d 248, 251 (N.C. 1954). The absolute privilege will also protect an out of court statement if it is made between the parties to a judicial proceeding or their attorneys and is relevant to the proceeding. Burton v. NCNB, 85 N.C. App. 702, 355 S.E.2d 800 (N.C. Ct. App. 1987). The privilege "is not restricted to trials in civil actions or criminal prosecutions but includes every proceeding of a judicial nature before a competent court or before a tribunal or officer clothed with judicial or quasi-judicial powers." Jarman, 239 N.C. at 472. However, "statements in pleadings and other papers filed in a judicial proceeding are not privileged if they are not relevant or pertinent to the subject matter of the action." Scott v. Statesville Plywood & Venner Co., Inc., 240 N.C. 73, 75, 81 S.E.2d 146, 149 (N.C. 1954). The matter not protected by the privilege "must be so palpably irrelevant to the subject matter of the controversy that no reasonable man can doubt its irrelevancy or impropriety." Id. at 76.

The court grants the motion in limine as to all four pieces of evidence. The court agrees the complaint and accompanying documentation to the North Carolina Licensing Board for General Contractors is absolutely privileged, as the Munros and Compass filed that complaint as part of an

administrative proceeding.[1] Munro's victim impact statement provided to the New Hanover District Attorney's Office is also absolutely privileged, as Munro provided that information as part of a criminal investigation and/or prosecution of DesChamps. While the court is unable to consider the contents of those documents, it may consider the fact that Munro and Compass filed the complaint against DBC and DesChamps with the Licensing Board and provided the victim impact statement to the District Attorney's Office regarding the criminal investigation and/or prosecution of DesChamps.[2] The affidavit of Shirley Strangstalien is absolutely privileged, as it was filed in the adversary proceeding before this court. Any testimony of Joel Macon regarding the contents of the complaint and communications with Munro during the investigation of the complaint are absolutely privileged, as they are part of the administrative proceeding before the Licensing Board. The court finds nothing discussed between Munro and Macon to be "so palpably irrelevant" as to remove it from the absolute privilege. While the court may not consider the content of the communications between Munro and Macon, the court may consider Munro's practice of telephoning Macon regularly on Fridays during the investigation. Munro admitted such conduct at trial.

Defamatory statements may also be protected by a qualified privilege. Munro and Compass assert that any communications with the following individuals regarding DBC and DesChamps are subject to a qualified privilege: (1) Dickson Bridger, Senior Vice President of the Mortgage Lending Department at

---

[1] The North Carolina Licensing Board for General Contractors is an administrative agency with rules and regulations set forth under the North Carolina Administrative Code at Title 21, Chapter 12. North Carolina General Statute, Chapter 87, Article 1 and 1A is applicable to the practice of general contracting. Individuals may bring grievances against general contractors before the Licensing Board, and general contractors are subject to discipline by the Licensing Board.

[2] At trial, Munro admitted that he filed the complaint against DBC and DesChamps with the Licensing Board and provided the victim impact statement to the District Attorney's Office. It is also a stipulated fact of the parties that Munro prepared the victim impact statement in November 2003.

Cooperative Bank; (2) Shirley Strangstalien, Assistant Vice President and Loan Originator of the Mortgage Lending Department at Cooperative Bank; (3) Scott Stewart, co-developer of DeVaun Park; and (4) Mark Brisson, owner of Coastal Window and Door Center. A qualified privilege exists if the communication is made: "(1) on a subject matter (a) in which the declarant has an interest, or (b) in reference to which the declarant has a right or duty, (2) to a person having a corresponding interest, right or duty, (3) on a privileged occasion, and (4) in a manner and under circumstances fairly warranted by the occasion and duty, right or interest." Phillips v. Winston-Salem/Forsyth County Board of Education, 117 N.C.App. 274, 278, 450 S.E.2d 753, 756 (N.C. Ct. App. 1994); Clark v. Brown, 99 N.C.App. 255, 393 S.E.2d 134 (N.C. Ct. App. 1990). The duty may be "public, personal, or private and of a legal, judicial, political, moral, or social nature." Clark, 99 N.C.App. at 262. A privileged occasion occurs "when for the public good and in the interests of society one is freed from liability that would otherwise be imposed on him by reason of the publication of defamatory matter." Averitt v. Rozier, 119 N.C.App. 216, 219, 458 S.E.2d 26, 29 (N.C. Ct. App. 1995). If a qualified privilege exists, it creates a presumption that the communication was made in good faith and without malice. Phillips, 117 N.C.App. at 278.

The court finds that the statements of Munro to Bridger and Strangstalien regarding DBC and DesChamps are subject to a qualified privilege. At Cooperative Bank, Bridger and Strangstalien review and underwrite loans in the Mortgage Lending Department and work with customers throughout the construction process. Munro had an interest in the successful completion of the Project and the proper management of the construction loan account that financed the Project. Bridger and Strangstalien had a corresponding interest in the construction loan account, the draws made on that account, and the progression of the Project. *See* Lever v. Community First Bankshares, Inc., 989 P.2d 634, 639 (Wyo.

12

1999)(bank loan officer and customer had corresponding interests regarding loan, and statements made by loan officer to customer regarding customer's new business associate were covered by a qualified privilege). While there is no recognized fiduciary relationship between a bank and customer sharing an ordinary debtor/creditor relationship under North Carolina law, Branch Banking and Trust Company v. Thompson, 107 N.C.App. 53, 61, 418 S.E.2d 694, 700 (N.C. Ct. App. 1992), it is obviously in the public interest for a bank and customer to be able to communicate freely regarding the handling of a construction loan and the progression of construction based upon draws from that loan. The communications regarding DBC and DesChamps' alleged misappropriation of construction loan money occurred during privileged occasions and under circumstances warranted by the interests at issue. The qualified privilege, however, is conditioned upon the court not finding actual malice or an improper/ulterior motive without good faith. *See* Jones v. Hester, 260 N.C. 264, 269, 132 S.E.2d 586, 589 (N.C. 1963).

      The court finds that Munro's statements to Stewart regarding DBC and DesChamps are not subject to a qualified privilege. Within a month after DBC filed bankruptcy, Munro and Stewart communicated approximately six times by telephone and approximately two times in person. Stewart volunteered to meet with Munro in order to move the Project forward. It is clear that Munro and Stewart shared corresponding interests regarding the completion of the Project. Munro had money invested in the Project, and Stewart had an unfinished house in the middle of his subdivision. However, the statements regarding misapplication of funds were not made during privileged occasions and under circumstances warranted by the interests at issue. While Stewart sold Munro the lot in DeVaun Park, he was not a party to the Project contract, he was not involved in the finances of the Project, and he was not privy to information regarding the construction loan. After DBC filed bankruptcy, Munro told Stewart that

DesChamps had misappropriated funds on the Project, and he discussed the type of recourse he intended to pursue against DesChamps, including his plan to bring a complaint before the North Carolina Licensing Board for General Contractors and to have DesChamps arrested. In testimony, Stewart said he urged Munro to accept his losses and work toward completion of the Project. There is no reason why, based on the public good and interests of society, Munro should be freed from liability for the statements made to Stewart regarding DBC and DesChamps. Munro and Stewart's shared interest was the completion of the home, and the accusations against DBC and DesChamps were not communicated under circumstances warranted by that common interest.

The court finds that the statements of Munro to Brisson are not subject to a qualified privilege. Munro and Brisson shared a common interest in the payment of Project expenses. Munro wanted the draws from the construction loan to be used toward completion of the Project, and Brisson wanted to be paid for supplies to the Project. During their telephone conversation a few weeks after the bankruptcy filing, Munro told Brisson that DBC had filed bankruptcy, that the funds on the Project had been misused, and that no funds for the windows and doors were available. However, no privileged occasion existed, as there is no public interest served by allowing Munro to escape liability for statements made to a supplier on the Project regarding the builder's alleged mishandling of funds. Brisson was not involved in the handling of the construction loan or finances on the Project, and Munro and Brisson's shared interest did not justify that statement.

DBC and DesChamps assert that Munro made the statements with actual malice. Whether actual malice exists is relevant to the admissibility of Munro's statements to Bridger and Strangstalien and the applicability of punitive damages. *See* <u>Jones v. Hester</u>, 260 N.C. 264, 269, 132 S.E.2d 586, 589 (N.C.

14

1963); Gibby v. Murphy, 73 N.C. App. 128, 133, 325 S.E.2d 673, 677 (N.C. Ct. App. 1985). Actual malice is evidenced by showing that the defendant made a statement "with knowledge that it was false, with reckless disregard to the truth, or with a high degree of awareness of its probably falsity." Clark v. Brown, 99 N.C.App. 255, 393 S.E.2d 134 (N.C. Ct. App. 1990); *see* Ponder v. Cobb, 257 N.C. 281, 294, 126 S.E.2d 67, 76 (N.C. 1962); Ramsey v. Cheek, 109 N.C. 270, 13 S.E. 775, 777 (N.C. 1891). The claimant may also demonstrate actual malice by evidence of ill-feeling, personal hostility, or threats on the part of the declarant. Ponder, 257 N.C. at 294. The claimant may rely on extrinsic evidence, the defamatory statement itself, or the circumstances attending the publishing of the defamatory statement. Id.; *see also* Goldwater v. Ginzburg, 414 F.2d 324 (2nd Cir. 1969), *cert. denied,* 396 U.S. 1049 (1970) ("There is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity").

Here, the evidence shows that Munro made the statements to Stewart, Brisson, Bridger and Strangstalien with reckless disregard for the truth. DBC filed bankruptcy on July 15, 2003. Within a month of the bankruptcy filing, Munro hastily made statements to the above-named individuals, asserting that DBC and DesChamps had misappropriated, misused, or embezzled funds on the Project. In September 2003, Munro received a facsimile from DesChamps accounting for the funds expended on the Project, and Munro admitted at trial that the facsimile provided some clarity regarding where the money had gone. By that time, however, Munro had already disclosed to others that DBC and DesChamps had misused the funds. The evidence also supports that Munro had ill feelings toward DesChamps. The court found the testimony of Stewart to be credible and compelling. Stewart said that Munro had a difficult time moving

forward with the Project because he was examining DesChamps' personal and professional life and focused on getting DesChamps arrested. Based on his communications with Munro, Stewart concluded that Munro was fixated on the matter and had a personal vendetta against DesChamps. The overall pattern of evidence before the court supports a finding of actual malice. Because actual malice exists, the qualified privilege is broken, and Munro's statements to Bridger and Strangstalien are admitted into evidence. The court may also consider punitive damages.

In North Carolina, the term "defamation" applies to the torts of slander and libel. Boyce & Isley, PLLC v. Cooper, 153 N.C.App. 25, 29, 568 S.E.2d 893, 898 (N.C. Ct. App. 2002). Here, DesChamps and DBC raise claims of slander per se and libel per se. Based on the admissible evidence, the claim of slander per se is applicable to the case at bar. Slander per se is "an oral communication to a third party which amounts to: (1) an accusation that the plaintiff committed a crime involving moral turpitude; (2) an allegation that impeaches the plaintiff in his trade, business, or profession; or (3) an imputation that the plaintiff has a loathsome disease." Phillips v. Winston-Salem/Forsyth County Board of Education, 117 N.C.App. 274, 277, 450 S.E.2d 753, 756 (N.C. Ct. App. 1994). To establish a claim for slander per se, the counter-claimant must prove: (1) counter-defendant "spoke base or defamatory words which tended to prejudice him in his reputation, office, trade, business or means of livelihood or hold him up to disgrace, ridicule or contempt; (2) the statement was false; and (3) the statement was published or communicated to and understood by a third person." West v. King's Department Store, Inc., 321 N.C. 698, 703, 365 S.E.2d 621, 624 (N.C. 1988); Friel v. Angell Care Inc.,113 N.C.App. 505, 509, 440 S.E.2d 111, 113-114 (N.C. Ct. App. 1994). "Where words are actionable per se, the law prima facie presumes malice and conclusively presumes damages, at least in a nominal amount, without specific proof

of injury." Johnson v. Bollinger, 86 N.C.App. 1, 9, 356 S.E.2d 378, 383 (N.C. Ct. App. 1987). In order to be actionable without proof of special damage, "the false words (1) must touch the plaintiff in his special trade or occupation, and (2) must contain an imputation necessarily hurtful in its effect on his business." Id. at 384.

The evidence supports a finding of slander per se. Munro made statements to Stewart, Brisson, Bridger, and Strangstalien, asserting that DBC and DesChamps had misused, misappropriated, and/or embezzled funds on the Project. First, these statements impugn the reputation of DBC and DesChamps in the construction business by conveying that DBC and DesChamps are dishonest and incompetent in their business dealings. Second, the statements are false. As noted above, Munro made these statements hastily after DBC filed bankruptcy and without knowledge of all the facts. The falsity of the statements is supported by the fact that the New Hanover County District Attorney's Office dismissed the criminal charges against DesChamps, and this court found no evidence to support Munro and Compass' embezzlement claim at the summary judgment hearing. Lastly, the statements were communicated and understood by third persons.

The court will award compensatory damages based upon Munro's statements to Stewart, Brisson, Bridger and Strangstalien. Because Munro's statements are actionable per se, DBC and DesChamps do not have to provide specific proof of injury. Bollinger, 86 N.C.App. at 9, 356 S.E.2d at 383. However, the evidence at trial supports that, as a result of Munro's statements made to Stewart, DBC and DesChamps have lost work opportunities in the community. As a developer, Stewart said he would no longer recommend or use DBC or DesChamps' current employer, Whitney Blair, for any projects. They have essentially been "black-balled" from working on any further projects involving Stewart or projects

17

where Stewart's recommendation would be requested. Stewart told approximately 12 other people in the local building industry about this matter, and Brisson told two officers of his corporation. It is clear that the statements harmed DBC and DesChamps' reputation in the local building community. Moreover, the statements made to Bridger and Strangstalien damaged DesChamps' work opportunities in the appraisal industry. In addition to his career as a builder, DesChamps works for his father at DesChamps Appraisal Group. In the previous seven years, DesChamps Appraisal Group had received approximately $3500 to $7500 of appraisal work annually from Cooperative. Within days after Bridger's deposition taken in this adversary proceeding, Bridger informed DesChamps Appraisal Group that it was no longer on the approved list of appraisers at Cooperative Bank. Since that time, DesChamps Appraisal Group has received no work from Cooperative Bank. Furthermore, DesChamps and his wife both testified that the slander had negatively impacted their social lives and familial relationship. The couple used to enjoy social activities but now avoid them as a result of the humiliation caused by the slander. Ms. DesChamps testified that the accusations had put a strain on the marriage and had negatively affected her husband's temperament. The court awards $70,000.00 to compensate DBC and DesChamps for damages caused by Munro's statements to Stewart, Brisson, Bridger, and Strangstalien. In setting this amount, the court notes that a substantial portion of the damages suffered by DesChamps flow from the dismissed criminal charges initiated by Munro. Because these statements are privileged here, they cannot support an award of damages. They are, however, encompassed within the separate malicious prosecution case pending in the New Hanover County Superior Court.

In addition to compensatory damages, the court will award punitive damages. Punitive damages may be awarded "to punish a defendant for egregiously wrongful acts and to deter the defendant and others

from committing similar wrongful acts." N.C. Gen. Stat. § 1D-1. In determining the amount of punitive damages to be awarded, the court "[m]ay consider only that evidence that relates to the following: (a) [t]he reprehensibility of the defendant's motives and conduct; (b) [t]he likelihood, at the relevant time, of serious harm; (c) [t]he degree of the defendant's awareness of the probable consequences of its conduct; (d) [t]he duration of the defendant's conduct; (e) [t]he actual damages suffered by the claimant; (f) [a]ny concealment by the defendant of the facts or consequences of its conduct; (g) [t]he existence and frequency of any similar past conduct by the defendant; (h) [w]hether the defendant profited from the conduct; or (I) [t]he defendant's ability to pay punitive damages, as evidenced by its revenues or net worth." N.C. Gen. Stat. § 1D-35. Here, in the wake of DBC filing bankruptcy, Munro heedlessly made statements to members of the local community that impugned DBC and DesChamps' reputations. At the time Munro made the statements to members of the community, there was a significant likelihood that the statements would negatively impact DBC and DesChamps' reputations. Munro was aware that DBC is a local operation. DesChamps, as a native of Wilmington whose professional and personal life are tied to the area, had everything to lose when Munro slandered his name and the name of his company. The law does not permit an individual to "get even" by impugning the reputation of others. Munro's reckless conduct should be punished and deterred. Taking into consideration all relevant factors before the court, an award of $30,000.00 in punitive damages is appropriate.

## CONCLUSION

The evidence supports a finding of slander per se against Munro and Compass. The court awards DBC and DesChamps $70,000 in compensatory damages and $30,000.00 in punitive damages.

**So Ordered.**

**Dated:        May 6, 2005**

                                        **S/ J. Rich Leonard**
                                        **J. Rich Leonard**
                                        **United States Bankruptcy Judge**